UNITED STATES DISTRICT COURT                                    ECF Case
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
BOBETTE J. MORIN,

                                        Plaintiff,             Civil Action No.


        -against-
                                                              **COMPLAINT**
                                                              **WITH JURY DEMAND**

HON. JAMES C. TORMEY, Individually and
in his Official Capacity as District Administrative
Judge of the Fifth Judicial District, HON. BRYAN
R. HEDGES, Individually and in his Official
Capacity as Judge of the Onondaga Family Court,
JOHN R. VONINSKI, Individually and in his
Official Capacity as Executive Assistant to the
District Administrative Judge, and WILLIAM F.
DOWLING, Individually and in his Official
Capacities as Law Clerk to FCJ Bryan Hedges and
as Fifth District Court Attorney Referee, THE
OFFICE OF COURT ADMINISTRATION OF
THE UNIFIED COURT SYSTEM, and THE
STATE OF NEW YORK,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        Plaintiff, **BOBETTE J. MORIN,** by her attorneys, **SAPIR & FRUMKIN LLP,** as and for

her Complaint against defendants, **HON. JAMES C. TORMEY,** Individually and in his Official

Capacity as Chief Administrative Judge of the Fifth Judicial Department, **HON. BRYAN R.**

**HEDGES**, Individually and in his Official Capacity as Judge of the Onondaga Family Court, **JOHN**

**R. VONINSKI,** Individually and in his Official Capacity as Executive Assistant to District

Administrative Judge Tormey, **WILLIAM F. DOWLING,** Individually and in his Official Capacity

as Law Clerk and Court Attorney Referee, **THE OFFICE OF COURT ADMINISTRATION OF**

**THE UNIFIED COURT SYSTEM ("OCA"),** and **THE STATE OF NEW YORK,** alleges as

follows:

## I.  NATURE OF CLAIMS

1.      This is an action for damages and injunctive relief caused by defendants' violation of plaintiff's civil rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("§ 1983") and the First Amendment to the Constitution of the United States, and of rights secured under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA").

## II.  JURISDICTION AND VENUE

2.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343.

3.      This Court is one of proper venue because plaintiff resides in this district, the allegations arose in this district and defendants have contacts with the Northern District of New York sufficient to subject it to personal jurisdiction if the Northern District of New York were a separate State.  Accordingly, venue lies in the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

## III.  PARTIES

4.      Plaintiff, Bobette J. Morin, is a citizen of the United States and a resident of the county of Onondaga and State of New York.  At all times relevant to this Complaint, Ms. Morin was an employee of defendants the State of New York and The Office of Court Administration of The State of New York, Unified Court System ("OCA"), within the meaning of the FMLA, 29 U.S.C. § 2601 (2).

5.      Defendants State of New York and OCA were and are at all times relevant herein are governmental entities created and authorized under the laws of the State of New York.

2

6. At all times relevant to this Complaint, defendants State of New York and OCA were employers within the meaning of the FMLA, 29 U.S.C. § 2601 (4), and were governmental entities acting under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York and OCA.

7. Defendants State of New York and OCA caused the violations set forth in this Complaint.

8. Defendants State of New York and OCA failed to adequately train their employees to prevent and/or correct the violations set forth in this Complaint.

9. Defendants State of New York and OCA failed to adequately supervise their employees to prevent and/or correct the violations set forth in this Complaint.

10. Defendants State of New York and OCA failed to prevent and aided and abetted in the violations set forth in this Complaint.

11. Defendant, Hon. James C. Tormey, is a citizen of the United States and a resident of the State of New York.  At all times relevant to this action, defendant Tormey was an elected Supreme Court Judge, appointed to the position of District Administrative Judge for the Fifth Judicial District, and was a policy maker for administrative and employment related matters in the Fifth Judicial District.

12. Upon information and belief, defendant Tormey was personally involved in the violations set forth in this Complaint.

13. Upon information and belief, defendant Tormey engaged in a pattern of persistent and widespread constitutional and statutory violations as set forth in this Complaint.

14.     Upon information and belief, defendant Tormey conspired with others to engage in the violations set forth in this Complaint.

15.     Upon information and belief, defendant Tormey aided and abetted the violations set forth in this Complaint.

16.     Defendant Tormey is sued in his individual and official capacities.

17.     Defendant, Hon. Bryan R. Hedges, is a citizen of the United States and a resident of the State of New York.  At all times relevant to this action, defendant Hedges was an elected Family Court Judge, appointed to the position of Acting Supreme Court Judge by defendant Tormey, and was a policy maker for administrative and employment related matters in the Onondaga Family Court.

18.     Upon information and belief, defendant Hedges was personally involved in the violations set forth in this Complaint.

19.     Upon information and belief, defendant Hedges engaged in a pattern of persistent and widespread constitutional and statutory violations as set forth in this Complaint.

20.     Upon information and belief, defendant Hedges conspired with others to engage in the violations set forth in this Complaint.

21.     Upon information and belief, defendant Hedges aided and abetted the violations set forth in this Complaint.

22.     Defendant Hedges is sued in his individual and official capacities.

23.     Defendant, John R. Voninski, is a citizen of the United States and a resident of the State of New York.  For the period of time from in or about 2000 through in or about 2006, defendant Voninski was employed by defendants State of New York and OCA, where he held the

position of Executive Assistant to defendant Tormey and was a policy maker for administrative and employment related matters in the Fifth Judicial District.

24.    Defendant Voninski was personally involved in the violations set forth in this Complaint.

25.    Defendant Voninski engaged in a pattern of persistent and widespread constitutional and statutory violations as set forth in this Complaint.

26.    Defendant Voninski conspired with others to engage in the violations set forth in this Complaint.

27.    Defendant Voninski aided and abetted the violations set forth in this Complaint.

28.    Defendant Voninski is sued in his individual and official capacities.

29.    Defendant, William Dowling, is a citizen of the United States and a resident of the State of New York.  At all times relevant to this action, defendant Dowling was an employee of defendants State of New York and OCA, where he held the position of Law Clerk to defendant Hedges and now holds the position of Court Attorney Referee in the Onondaga Family Court having been appointed to said position by defendant Tormey, and pursuant to the direction of defendant Tormey became a policy maker for administrative and employment related matters in the Onondaga Family Court.

30.    Defendant Dowling was personally involved in the violations set forth in this Complaint.

31.    Defendant Dowling engaged in a pattern of persistent and widespread constitutional and statutory violations as set forth in this Complaint.

32.    Defendant Dowling conspired with others to engage in the violations set forth in this Complaint.

33.    Defendant Dowling aided and abetted the violations set forth in this Complaint.

34.    Defendant Dowling is sued in his individual and official capacities.

## IV.  FACTS UNDERLYING PLAINTIFF'S CLAIMS

35.    In 1994, Ms. Morin was appointed Chief Clerk of Onondaga Family Court (JG-32) by a statewide panel of five individuals.  Ms. Morin served as Chief Clerk of Onondaga Family Court from 1994 until her involuntary removal and forced demotion by defendants on March 8, 2007.  A JG-32 position is the highest non-judicial pay grade for Chief Clerks and Agency Managers ("CCAMs") in the Fifth Judicial District.  Prior to her tenure as Chief Clerk, Ms. Morin was similarly appointed by a statewide panel as Deputy Chief Clerk of Onondaga Family Court and served in that capacity from 1986 to1994 and has been an employee of defendants New York State and OCA since 1983.  In more than twenty-three years of service to the Unified Court System, Ms. Morin has consistently been recognized for her abilities and contributions as a skilled and experienced court administrator, has been the recipient of court system awards including the prestigious Merit Performance Award, has been elected an officer and president of the New York State Association of Family Court Clerks by her colleagues, and was nominated by her staff in July 2006 for the Unified Court System's Quality Service and Leadership Award for her outstanding achievements, innovation, and leadership in Onondaga Family Court.  In addition, throughout her long service in Family Court, Ms. Morin has served on many statewide committees studying family court issues and was asked by Chief Administrative Judge Jonathan Lippman to represent NYS family courts in a vast juvenile fingerprinting project with the New York State Division of Criminal Justice Services.

36.     In early 2000, defendant Tormey replaced Hon. William R. Roy as District Administrative Judge for the Fifth Judicial District and immediately took unprecedented steps to replace Executive Assistant Frank Jordan with defendant Tormey's law clerk, defendant Voninski.

37.     In or about Summer 2002, defendant Voninski, came to see plaintiff in her office and was extremely friendly toward Ms. Morin, which was unusual.  Defendant Voninski then asked Ms. Morin to "take a walk with him" and defendant Voninski escorted her to the chambers of defendant Tormey.

38.     Defendant Tormey greeted Ms. Morin with a kiss and a hug and commended her for the "great job" she did in Family Court.  After receiving a personal tour of defendant Tormey's newly renovated office suite, Ms. Morin was taken to defendant Tormey's chambers.

39.     Defendant Tormey initiated a discussion with Ms. Morin about the Supreme Court judicial races which were to be decided that Fall and stated that Onondaga Family Court Judge David G. Klim was running on the Democratic ticket against "good Republican friends of mine..." Defendant Tormey asked Ms. Morin if she "...was a good Republican...and whether she wanted to be a 'team player'... "  Ms. Morin did not respond.

40.     Defendants Tormey and Voninski repeatedly attempted to elicit from Ms. Morin false negative opinions and information regarding Judge Klim including that he was a "lousy judge," "he was out of the courthouse excessively," "attorneys think he is stupid," "many complaints must be received about him", "he doesn't know what he is doing," "he refuses to try cases," and that he has "damaging personal baggage."

41.     Defendants Tormey and Voninski persistently sought negative information from Ms. Morin by stating that Judge Klim "is a sympathetic candidate and 'media darling' and because of

his disability will get endorsed by the paper, [so it is important to] get information out there to help the Republican candidates."  Similar sentiments also were later publicly echoed by defendants Hedges and Dowling.

42.    Ms. Morin refused the requests of defendants Tormey and Voninski to spy on, and provide incorrect negative information about Judge Klim.  Ms. Morin stated that she did not believe it was her role, as Chief Clerk, to get involved in political races and that she also believed it was a violation of the Rules of the Chief Judge.

43.    In response to Ms. Morin's refusal, defendants Tormey and Voninski became visibly angry.  Defendant Tormey's demeanor changed abruptly and, red-faced, directed Ms. Morin to "get out of my office!"

44.    From that day on, Ms. Morin was subjected to a continuously hostile work environment by defendants.  She became the target of unwarranted criticism, repeated and persistent slanderous statements, harassment and retaliatory treatment by defendants Tormey, Voninski and others within their sphere of influence.

45.    This hostile environment and retaliatory treatment included repeated and unjustified refusals to fill staff vacancies in Ms. Morin's office (Onondaga Family Court), repeated denials of requests for materials and support for Onondaga Family Court, exclusion from meetings, verbal abuse, denial of information relevant to her duties, usurpation of Ms. Morin's duties and countermanding Ms. Morin's decisions in an attempt to embarrass and undermine her with staff, failure to provide Ms. Morin an office adequate and commensurate with her position (other than an offer to move her to the old paint shop office in the basement of the courthouse or to a vacant, windowless first floor storeroom beneath a leaky toilet), failure to assign duties/responsibilities, and

refusal to appoint to committees despite requests and recommendations from other individuals in OCA.  In response to OCA recommendations that Ms. Morin be utilized because of her skills and experience, defendants stated  "we are choosing a different route."

46.     The aforementioned activities against Ms. Morin continue unabated to the present time.

47.     In 2005, Ms. Morin was required to take two leaves of absence to attend to personal medical conditions, one in the Spring and one in the Fall.  Both of Ms. Morin's 2005 leaves were substantiated by documentation from her physician and approved as Family and Medical Leaves by the District Administrative Office.  Upon information and belief, during the first medical leave discussions were held with defendants regarding the possibility that Ms. Morin would not return to work due to her medical condition.  However, in short order, Ms. Morin did return to work.

48.     In  October 2005, after returning from her second medical leave, Ms. Morin's supervisor, defendant Voninski, demonstrated his animus regarding her exercise of protected FMLA rights.

49.     Despite her adherence to OCA policy and the approval granted for use of protected leave, Ms. Morin was chastised by defendant Voninski for failing to consult personally with him about her leave request and her medical condition.

50.     Soon after this incident, Ms. Morin became the subject of additional intense and unwarranted harassment and criticism by defendant Voninski and his close associate, defendant Dowling.

51.     On February 10,  2006, defendant Dowling verbally berated Ms. Morin and threatened  her position, stating that she had "pissed off the wrong person, that [he] knew people,

and that [she] would be sorry she ever crossed his path." He further stated, in connection with his unwarranted criticisms, threats and complaints, that he was going directly to defendants Voninski and Tormey who "want to get rid of you."

52.     Immediately thereafter, several of Ms. Morin's subordinates were reassigned by defendants without her consultation or approval. Ms. Morin was informed that defendant Dowling, referring to Ms. Morin, remarked to another employee that he was going to "get that fucking bitch if it's the last thing I do," bragged that he had "sicced" defendants Voninski and Tormey on her, and that he would not rest until he had her fired. Defendant Dowling stated he would see to it that defendant Tormey would "get rid of her [Ms. Morin] once and for all because she wasn't a team player."

53.     On February 20, 2006, Ms. Morin was castigated by defendant Voninski for failure to obtain prior approval from him for the usage of a few hours of annual leave as noted on her time report, although no other Chief Clerk and Agency Manager (CCAM) was held to this standard and no such requirement had ever been articulated. Ms. Morin was issued a disciplinary memorandum and verbally abused by defendant Voninski. As "punishment" (defendant Voninski's words), unlike other CCAMs or Grade 32 employees, Ms. Morin was required to call defendant Voninski from her office phone at the beginning and ending of each work day to confirm her arrival and departure.

54.     Ms. Morin complied with defendant Voninski's directive religiously, though most of the time defendant Voninski was not in his office and Ms. Morin was forced to leave voice mail to note her arrivals and departures.

55.     Upon information and belief, this unprecedented punishment was an attempt to set up Ms. Morin for dismissal should she not comply with defendant Voninski's written directive or not be able to prove she complied with it.

56.     Approximately two weeks after Ms. Morin began the above described daily protocol, Ms. Morin was unable to login to her e-mail program.  She immediately reported this failure to a computer technician.

57.     Upon information and belief, defendant Voninski had removed, or directed removal of Ms. Morin's password and assignment of a new password, so he could  read and review Ms. Morin's e-mails.  Upon information and belief, defendants had not taken this action against other CCAMs.

58.     Within days of the foregoing, in or about early March 2006, defendant Voninski informed Ms. Morin by e-mail that, per defendant Tormey's wishes, his office would be conducting an audit of the Onondaga Family Court operation and her actions because he had concerns.

59.     Defendant Voninski assigned as an auditor an employee under his authority who had never worked in a court, let alone Family Court, and who did not have auditing experience.  This employee refused to speak or discuss the audit with Ms. Morin.  Instead the auditor spoke to selected supervisors in an attempt to solicit negative information about Ms. Morin and the Onondaga Family Court operation.

60.     When Ms. Morin questioned why no one spoke to her about the audit, Ms. Morin was rudely told that "those were the instructions and you'll get a report with recommendations when I'm done."  No such report was ever received.

61.     Shortly thereafter, in April 2006, defendant Voninski notified Ms. Morin by e-mail that she was temporarily reassigned to the smaller Lewis County Family Court in Lowville for five weeks in April, May, June, July and August 2006.  The court in Lowville was 100 miles away from her home, requiring Ms. Morin to commute four hours each day.

11

62.     Upon arriving in Lowville, Ms. Morin was informed by the employees there that they had not asked for someone of her skill level.   Rather, Ms. Morin learned that the vacationing employee was directed to take time off by defendant Voninski so he would have an excuse to assign Ms. Morin there.   However, during this very same employee's lengthy medical absence in 2005, no replacement coverage was provided to the court in Lowville.   Nevertheless, in 2006 when vacations were ordered by defendant Voninski, Ms. Morin apparently was the only suitable employee throughout the entire Fifth Judicial District to provide coverage at great expense to the State of New York.

63.     In Lowville, Ms. Morin, a Grade 32 Chief Clerk, was tasked to perform duties suitable for a Grade 12 employee, *i.e.* processing support petitions.   Moreover, the aforementioned employee did not actually take vacation time during Ms. Morin's first two weeks in Lowville, April 24-May 5, 2006, thereby making Ms. Morin's presence there unnecessary.

64.     Ms. Morin continued to call in to defendant Voninski from Lowville to report her arrivals and departures.

65.     On or about May 5, 2006, at the end of her initial two week tenure in Lowville, upon information and belief, defendant Voninski questioned the Chief Clerk in Lowville regarding Ms. Morin.  Ms. Morin was informed that he questioned Ms. Morin's attitude, what she had done during the two weeks, and whether she had "said anything or complained" or "had been good about her time."  Upon information and belief, defendant Voninski was told that Ms. Morin "was usually the first person in the office despite her two hour commute, [that] she had been great, had a positive attitude and offered to help out in any way."  Defendant Voninski was also informed that Ms. Morin "single-handedly had gotten the support petitions caught up..." (which had been more than a month

12

behind).  Ms. Morin was informed that, upon hearing this positive information, defendant Voninski said nothing and walked out.

66.     Within two days of her return to Syracuse, on or about May 10, 2006, Ms. Morin received an e-mail from defendant Voninski reassigning her to the Oneida Family Court in Rome. This punitive assignment required Ms. Morin to commute two hours each day.  Ms. Morin was told she was to cover for a retiring supervisor and Deputy Chief Clerk.

67.     Upon her arrival in Rome, Ms. Morin was informed that they did not know what she was supposed to do and that they had not asked to be provided help by someone at Ms. Morin's skill level.  In response to Ms. Morin's inquiry of what needed to be done, she was told that the file room needed to be reorganized.

68.     For five months, Ms. Morin, Chief Clerk of Onondaga County Family Court, was punitively assigned by defendant Voninski to serve as a fill-in worker for employees in Lowville and Rome.  Upon information and belief, this harassment and retaliatory conduct was orchestrated by defendants Tormey, Hedges and Dowling and implemented by defendant Voninski.  Despite the continued harassment, Ms. Morin accepted the reassignments with grace and professionalism and performed whatever duties were necessary to insure the smooth operation of the respective courts.

69.     Ms. Morin continued to call in to defendant Voninski from Rome to report her arrivals and departures.

70.     Upon information and belief, while Ms. Morin was on assignment outside of Syracuse, defendants Voninski, Dowling, Hedges and Tormey, and others within their sphere of influence, undertook a concerted effort to solicit complaints about Ms. Morin from her coworkers and subordinates.  Upon information and belief, courthouse employees were pressured to provide

negative information about Ms. Morin and were rewarded with promotions and reassignments or promises of same if they did so.

71.     Upon information and belief, defendants and others within their sphere of influence reviewed confidential personnel files and contacted former employees in order to solicit negative information about Ms. Morin.

72.     Upon information and belief, one former employee expressed concern over defendants indiscriminate review of her confidential personnel file and refused to say anything negative about Ms. Morin but rather conveyed positive information to defendants regarding Ms. Morin.  Upon information and belief, one former employee conveyed this information to Investigator Thomas Testo of the UCS Inspector General's office.

73.     Upon information and belief, in or about May 2006, a current employee with a documented attendance problem and who had been counseled by Ms. Morin on three occasions was interrogated for more than two hours by defendants Hedges and Dowling in defendant Hedges' chambers.  Upon information and belief, defendants Hedges and Dowling attempted to pressure this employee to provide negative information about Ms. Morin by stating that Ms. Morin had unfairly picked on her because of her attendance issues.  Upon information and belief, defendants Hedges and Dowling directed this employee, "don't tell anyone where you've been or what we have talked about."  Within two weeks, this employee's transfer request to a court closer to home, which had been pending for several years, was granted.  Upon information and belief, this employee conveyed this information to Investigator Thomas Testo of the UCS Inspector General's office.

74.     In June 2006, while still serving in the Rome facility of Oneida Family Court, Ms. Morin learned that, as a result of defendants' retaliatory efforts to solicit negative information about

14

her, internal but unspecified charges had been filed against her with the Office of the Inspector General by defendants.

75.     Although not informed of the substance of the charges against her, Ms. Morin, accompanied by counsel, appeared for an interview with Investigator Thomas Testo on July 31, 2006.

76.     During the investigatory interview, Ms. Morin defended herself against the baseless and unwarranted charges against her and provided documentation in support, as well as the names of other individuals who could substantiate Ms. Morin's statements.  Moreover, she informed the Inspector General's Office of the hostile work environment and retaliatory conduct she had suffered in connection with her usage of protected medical leave, and provided numerous examples of mismanagement and abuses by defendants which undermined the effective and proper administration of the court system.

77.     Subsequently, on several occasions in August 2006, Ms. Morin, by her attorneys, sent letters and e-mail correspondences to Deputy Administrative Judge Jan Plumadore and Mr. Testo further documenting the hostile work environment, retaliation, misconduct and abuses of power by defendants.

78.     On August 11, 2006, a lengthy supplemental statement providing additional information regarding Ms. Morin's interview with Investigator Testo, with numerous e-mail attachments substantiating her claims, was sent by Ms. Morin's attorneys to Investigator Testo.

79.     On August 11, 2006, a letter setting forth Ms. Morin's complaints regarding her adverse treatment in connection with the FMLA usage and the long standing harassment and retaliatory conduct by defendants was sent to Hon. Jan H. Plumadore, Deputy Chief Administrative Judge Outside New York City, with copies sent to Mr. Testo and defendant Tormey.

80.     Upon information and belief, on August 15, 2006, Investigator Testo traveled to Syracuse to conduct additional interviews and to speak with defendant Tormey.

81.     Suddenly on August 16, 2006 defendant Voninski's retirement was announced effective September 2006 and on August 23, 2006, Ms. Morin was "released from [her intra-district assignments] and ordered back to Syracuse by defendant Voninski.

82.     One day before Ms. Morin's return to Syracuse, Mr. Testo was informed of Ms. Morin's fear of continued retaliation upon her return to Syracuse and being set up to fail by defendants' continued harassment.  Upon information and belief, defendants were livid that Ms. Morin was returning to Syracuse and had survived the investigation by the Inspector General.  Ms. Morin was informed that one or more defendants had expressed that they were more determined than ever to "get the fucking bitch."

83.     On August 30, 2006, Ms. Morin returned to her position as Chief Clerk of the Family Court of Onondaga County after serving over five months as a fill-in worker for employees in Lowville and Rome.

84.     Investigator Testo subsequently was informed of additional threats of retaliation expressed by defendant Dowling, including the statement that "this thing is not over and I am not letting this go." Investigator Testo also was informed that defendant Dowling referred to Ms. Morin as a "cunt" to other court employees and that he stated, "just because she is back in Syracuse doesn't mean that this is over," and, "I'm gonna get that fucking bitch yet."

85.     Ms. Morin also provided documentation to Investigator Testo reflecting the continued involvement of defendant Hedges in the retaliatory conduct, including the removal of several of Ms. Morin's duties and responsibilities as Chief Clerk.

86.     After Ms. Morin's return to Syracuse, the retaliatory actions by defendants did not abate.  In fact, the retaliation escalated and, upon information and belief, there was a conspiratorial effort to discredit and eviscerate Ms. Morin's authority as Chief Clerk in order to force her out one way or another.

87.     Within days of defendant Voninski's retirement and departure at the end of September 2006, defendant Dowling visited Ms. Morin in her office.  Defendant Dowling informed her that in the "vacuum created by defendant Voninski's departure, defendant Dowling would henceforth be in charge of Family Court operational decisions."  When Ms. Morin indicated that she was still the Chief Clerk of the Court and inquired as to the necessity of this unprecedented action, defendant Dowling stated that he was doing this at the direction of defendant Tormey because they had concerns about Ms. Morin's abilities.

88.     Beginning in October 2006 and thereafter, Ms. Morin was excluded from meetings and decisions regarding matters within the purview of her office by defendants.

89.     Upon information and belief, despite his retirement, defendant Voninski remained on the payroll as a consultant and continued to meet regularly with the other defendants.

90.     Ms. Morin, through her attorneys, contacted court officials in Albany on several occasions seeking closure to the Inspector General's investigation.  Upon information and belief, no findings had been made against Ms. Morin, and since defendant Voninski was purportedly gone and Ms. Morin was back in Syracuse, it was believed the matter would simply go away.

91.     In late October 2006, Michael Klein was appointed District Executive to replace defendant Voninski.

92.     Ms. Morin was told by numerous individuals in OCA, including District Executive Michael Klein and an assistant to Deputy Chief Administrative Judge Plumadore, to give Mr. Klein time to "smooth things out."  Mr. Klein told Ms. Morin that "none of this should have happened," but that he needed time to "sort out a delicate situation."

93.     However, throughout October, November and December 2006, the hostile work environment and retaliatory conduct against Ms. Morin by defendants continued and escalated.

94.     Defendant Dowling, with the approval and acting on the authority of defendants Tormey and Hedges, continued to usurp Ms. Morin's authority by regularly meeting with and directing her subordinates outside her presence, failing to inform Ms. Morin of his decisions, countermanding her decisions, and assuming responsibility for duties traditionally assigned to the Chief Clerk, including hiring new employees.

95.     Suddenly, in the Fall of 2006, numerous staff vacancies which had remained unfilled for several years because the District had been "over its quota," according to defendant Voninski, were now being filled by defendant Dowling at the direction of defendant Tormey.

96.     Defendant Dowling further undermined Ms. Morin's authority by telling employees not to listen to her and by making untrue derogatory remarks including that Ms. Morin was "stupid," "lazy," "incompetent," "had gone around the bend," "was so stupid that she came back to Syracuse when she knows we don't want her here," and that "the only reason she [Ms. Morin] is back in Syracuse is because they couldn't wait to get rid of her in Rome."

97.     The hostile work environment, harassment and retaliation by defendants continued unabated throughout the Fall of 2006.  Employees who supported Ms. Morin were threatened by defendants.  Employees who favored defendants were rewarded with promotions and reassignments or the promises of same.

98.     Upon information and belief, defendants sought information on who prepared and circulated a petition signed by numerous employees nominating Ms. Morin for the 2006 Quality Service Leadership Award and defendant Voninski indicated he would seek charges of insubordination against those employees.

99.     In or about late December 2006, Ms. Morin asked District Executive Michael Klein when this continued usurpation, harassment and retaliation against her would cease and she would be allowed to do her job.  Mr. Klein replied that and that there was "nothing he could do" and "it is going to get worse before it gets better."

100.    On January 8, 2007, defendant Hedges stated in an e-mail to Onondaga Family Court staff that, pursuant to the direction of defendant Tormey, defendant Dowling was henceforth in charge of all family court operations and that all issues were to be directed to defendant Dowling, thereby effectively eviscerating Ms. Morin's authority as Chief Clerk.  This e-mail was so disturbing to staff that some inquired as to whether Ms. Morin was still employed.

101.    On January 12, 2007, Ms. Morin was informed by a court employee that defendant Tormey had stated  he "was gonna take her out."  Upon information and belief, when this employee complained about the actions of defendants Dowling and Hedges and stated that Ms. Morin was the reason Onondaga Family Court ran so well, defendant Tormey angrily stated "you are either on my team or out of here."

102.    On January 17, 2007, a letter was sent on behalf of Ms. Morin to Judge Plumadore, copied to the Hon. Jonathan Lippman, Chief Administrative Judge, Hon. Ann T. Pfau, First Deputy Chief Administrative Judge, and Mr. Testo, outlining the hostile work environment, retaliation and abuses she continued to suffer at the hands of defendants.  In addition, Ms. Morin disclosed the

overall dysfunction at the Family Court and in the District Office, including instances of misconduct and abuse by senior officials.

103.    Thereafter, Ms. Morin was requested to attend a meeting with District Executive Michael Klein, and John Sullivan, Assistant Deputy Counsel for defendant OCA.

104.    On January 30, 2007, Ms. Morin and counsel met with Messrs. Klein and Sullivan. In this meeting, Ms. Morin again raised the issues of retaliation and misconduct by senior court officials.  These statements were never directly addressed, but Mr. Sullivan spoke of the alleged "factionalism" which existed in the Court according to defendants.

105.    Ms. Morin was informed that, based upon the findings of the Inspector General's Office, it was recommended that she be terminated as Chief Clerk of the Onondaga Family Court and placed in an a lower position with loss of salary.  When questioned, Messrs. Klein and Sullivan refused to divulge any of the purported findings or whether the unwarranted allegations were substantiated.  They simply stated that they "were not authorized to discuss the report" and that the "report was confidential."  When pressed for specific information, Messrs. Klein and Sullivan stated that Ms. Morin had "lost the confidence of certain court administrators," specifically naming defendant Tormey, and the recommendation was removal from office.

106.    Despite this recommendation and purported "loss of confidence," Messrs. Klein and Sullivan informed Ms. Morin that, because of her years of service and in recognition of her experience and abilities, defendant Tormey was prepared to offer her a position in the Fifth Judicial District as a Court Attorney Referee ("CAR").  The proposed duties would be presiding over custody, visitation, and child permanency issues and Ms. Morin was told that she could be placed in this position without application, interview or interruption of service time.  The position of Court

Attorney Referee involves a diminution of salary and benefits for Ms. Morin.  Messrs. Klein and Sullivan further threatened Ms. Morin that "this is the only offer on the table."

107.    On March 7, 2007, Ms. Morin received a one sentence certified letter from defendant Tormey appointing her as a CAR effective the next day, March 8, 2007, thereby effectively terminating Ms. Morin as Chief Clerk of Onondaga Family Court and forcibly demoting her.  Rather than face unemployment and greater diminution in pension and other benefits, Ms. Morin was forced to accept the assignment to the lower paying, undefined CAR position.

108.    On March 7, 2007, Ms. Morin was visited by District Executive Michael Klein and told that the "long nightmare is over."  Mr. Klein said that she would be removed from the Courthouse and have an office in the County Office Building which "would be better for everybody," and that she would be assigned to Oswego and Oneida Counties to handle custody and visitation cases and eventually child permanency cases as well.

109.    On March 12, 2007, Ms. Morin began her employment as a CAR in Rome and Oswego, resulting in an increase in commuting time to two hours per day.

110.    Defendants hostile work environment and retaliatory treatment of Ms. Morin did not cease upon the commencement of her new employment.

111.    Upon arriving in Rome to observe CAR proceedings for training purposes, Ms. Morin learned that employees with whom she had previously worked closely with in 2006 during her temporary assignment there, were instructed not to speak with her.

112.    In addition, Ms. Morin was severely and publicly reprimanded for "failing to arrange an observation through the Chief Clerk."  In fact, Ms. Morin had arranged the observation through District Executive Michael Klein, Judicial Hearing Officer Frank Cook and his court assistant, and

the Chief Clerk.  Moreover, the Chief Clerk had printed the court calendars for Ms. Morin.

113.   Ms. Morin was further publicly humiliated by defendants when they demanded return of any keys or proximity access cards to the Rome facility Ms. Morin possessed despite the fact that Ms. Morin had been assigned to the Rome facility of Oneida Family Court and it is routine for employees to have such keys and/or cards.

114.   In addition, Ms. Morin was informed that no further observations would be allowed unless cleared by individuals who held inferior positions to Ms. Morin.  Upon information and belief, this directive was issued by defendant Tormey.

115.   In fact, Family Court proceedings are open to the public and Ms. Morin, as a court employee tasked to preside over court proceedings, was being barred from observing and training with an experienced Judicial Hearing Officer performing the duties she later would be required to perform.

116.   While in Rome, a court employee was assigned to follow Ms. Morin throughout the day, even when she went to the restroom.

117.   Upon information and belief, this hostile work environment and retaliatory actions were taken by defendants to further harass and humiliate Ms. Morin in front of court staff and to intimidate and control her actions.

118.   Subsequently, District Executive Klein indicated to Ms. Morin that because of the events which took place in Rome, perhaps it would be better if Ms. Morin spent all her time in Oswego County Family Court, which requires a 100 mile daily commute for Ms. Morin.

119.   Ms. Morin also has been set up to fail in her new position in Oswego Family Court. Ms. Morin learned that she is to be assigned cases which other judges cannot settle and are near the

end of their Standards and Goals period, the primary tool in measuring successful management of a caseload.

120.    Unlike other CARs,  Ms. Morin has been denied support staff in the performance of her duties.

121.    As a result of the ongoing hostile work environment and acts of retaliation, Ms. Morin has suffered physical and emotional distress requiring her to seek medical attention.  On March 29 2007, Ms. Morin was directed by her physician to temporarily cease work due to serious concerns about her health.

## V.  AS AND FOR PLAINTIFF'S FIRST CLAIM
### *Deprivation of Rights Under the First Amendment of the United States Constitution and Unlawful Retaliation for First Amendment Right to Free Speech Cognizable Under 42 U.S.C. § 1983*

122.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "121," as though fully set forth herein.

123.    The conduct and actions of defendants in retaliating against Ms. Morin and subjecting her to a hostile work environment, culminating in the termination of her position and demotion, were unlawful, oppressive and a malicious attempt to retaliate against her for having exercised her Constitutional Right of Free Speech as a private citizen regarding matters of public concern, and to deprive her of that right in violation of the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

124.    Defendants' conduct and actions were intentional, malicious, taken with deliberate indifference and/or reckless disregard for the natural and probable consequences, and without lawful justification or reason.

125.    Defendants' conduct and actions constituted, and were in conformity with, the policies, practices and/or customs of defendants State and OCA, and were committed by individuals who were final policy makers and acting under the color of law.

126.    Defendants conduct and actions created a hostile work environment commencing from in or about the Summer of 2002, and continuing without interruption until the present date, and thereby constituted a continuing violation.

127.    Defendants failed to prevent or correct the conduct and actions that deprived plaintiff of her Constitutional rights.

128.    Defendants failed to train their employees not to engage in the conduct and actions that deprived plaintiff of her Constitutional rights.

129.    As a direct and proximate result of said acts, plaintiff has suffered and continues to suffer damages, including, but not limited to, lost salary and benefits and interest thereon, pain and suffering, humiliation, mental anguish, emotional distress and loss of enjoyment of life.

### VI.  AS AND FOR PLAINTIFF'S SECOND CLAIM
*Deprivation of Rights Under the First Amendment of the United States Constitution and Unlawful Retaliation for First Amendment Political Activity and/or Conduct Cognizable Under 42 U.S.C. § 1983*

130.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "121," as though fully set forth herein.

131.    The conduct and actions of defendants in retaliating against Ms. Morin and subjecting her to a hostile work environment, culminating in the termination of her position and demotion, were unlawful, oppressive and a malicious attempt to retaliate against her for having exercised her Constitutional Rights to engage in, or refrain from engaging in, political activity, and to deprive her of those right in violation of the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

24

132.    Defendants' conduct and actions were intentional, malicious, taken with deliberate indifference and/or reckless disregard for the natural and probable consequences, and without lawful justification or reason.

133.    Defendants conduct and actions created a hostile work environment commencing from in or about the Summer of 2002, and continuing without interruption until the present date, and thereby constituted a continuing violation.

134.    Defendants' conduct and actions constituted, and were in conformity with, the policies, practices and/or customs of defendants State and OCA, and were committed by individuals who were final policy makers and acting under the color of law.

135.    Defendants failed to prevent or correct the conduct and actions that deprived plaintiff of her Constitutional rights.

136.    Defendants failed to train their employees not to engage in the conduct and actions that deprived plaintiff of her Constitutional rights.

137.    As a direct and proximate result of said acts, plaintiff has suffered and continues to suffer damages, including, but not limited to, lost salary and benefits and interest thereon, pain and suffering, humiliation, mental anguish, emotional distress and loss of enjoyment of life.

## VII.  AS AND FOR PLAINTIFF'S THIRD CLAIM
### Retaliation Under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq.

138.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "121," as though fully set forth herein.

139.    Defendants' conduct described herein violates the anti-retaliation provision of the FMLA set forth in 29 U.S.C.§ 2615(a)(1).

140.    Defendants conduct and actions created a hostile work environment commencing from in or about October 2005, and continuing without interruption until the present date, and thereby constituted a continuing violation.

141.    Upon information and belief, the violation by defendants was willful and not in good faith, and plaintiff is therefore entitled to liquidated damages.

142.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer damages, including but not limited to lost wages and benefits, interest, and reasonable attorney's fees and costs.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE,** plaintiff respectfully requests that the Court:

1.    Declare defendants' conduct complained of herein to be a violation of plaintiff's rights as secured by the First Amendment of the United States Constitution, 42 U.S.C. § 1983 and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601.

2.    Award plaintiff the following damages:

## ON THE FIRST CLAIM

3.    Damages in the amount of any wages, salary, employment benefits and other compensation denied or lost to Ms. Morin by reason of the violations;

4.    Reinstatement to her previous position with all rights, seniority and benefits appurtenant thereto that would have been earned had her position not been abolished;

5.    Compensatory damages in an amount to be determined at trial for pain and suffering, humiliation, mental anguish, emotional distress, and loss of enjoyment of life sustained by plaintiff;

6.      Interest on the amount described above calculated at the prevailing rate;

7.      Reasonable attorney's fees and costs incurred in prosecuting this action; and,

8.      Punitive damages against the individual defendants.

## ON THE SECOND CLAIM

9.      Damages in the amount of any wages, salary, employment benefits and other compensation denied or lost to Ms. Morin by reason of the violations;

10.     Reinstatement to her previous position with all rights, seniority and benefits appurtenant thereto that would have been earned had her position not been abolished;

11.     Compensatory damages in an amount to be determined at trial for pain and suffering, humiliation, mental anguish, emotional distress, and loss of enjoyment of life sustained by plaintiff;

12.     Interest on the amount described above calculated at the prevailing rate;

13.     Reasonable attorney's fees and costs incurred in prosecuting this action; and,

14.     Punitive damages against the individual defendants.

## ON THE THIRD CLAIM

15.     Damages in the amount of any wages, salary, employment benefits and other compensation denied or lost to Ms. Morin by reason of the violations;

16.     Reinstatement to her previous position with all rights, seniority and benefits appurtenant thereto that would have been earned had her position not been abolished;

17.     Interest on the amount described above calculated at the prevailing rate; and,

18.     Reasonable attorney's fees and costs incurred in prosecuting this action.

## ON ALL CLAIMS

19.     That the Court grant plaintiff such other and further relief as it deems just and proper.

## IX.  JURY DEMAND

Plaintiff demands a trial by jury with respect to all issues and claims properly before a jury.

Dated: White Plains, New York
         May 15, 2007

Yours, etc.,
**SAPIR & FRUMKIN LLP**


By:   /s William D. Frumkin
         William D. Frumkin (Bar No. 104734)
         Attorneys for Plaintiff
         399 Knollwood Road, Suite 310
         White Plains, New York 10603
         (914) 328-0366

F:\APPLICAT\WP\Morin\Complaint.05.07.wpd\rlh